Filed 2/22/16

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JERSON H. GARCIA et al.,<br><br>    Defendants and Appellants. | D065101<br><br><br>(Super. Ct. Nos. SCN319198-1,<br>SCN319198-2 & SCN319198-3) |

APPEAL from judgments of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.


Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant Jerson H. Garcia.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Fransisco Mendoza.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant Irwin Alejandro Guzman.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Jerson H. Garcia, Fransisco Mendoza, and Irwin Alejandro Guzman (collectively defendants) were convicted of charges arising out of robberies they committed together in Escondido.  Garcia was a member of the Eastside gang in San Diego; Mendoza and Guzman were members of the Diablos gang in Escondido.  Each defendant received an enhancement of their respective sentences for committing gang-related crimes.  (Pen. Code, § 186.22, subd. (b)(1).)  Defendants claim in their appeals that: the trial court abused its discretion in failing to bifurcate trial of the gang enhancements; pretrial identification procedures were unduly suggestive; jury instructions allowed the jurors to equate motive with intent, lessening the burden needed for conviction; and the prosecution failed to produce sufficient evidence showing that the charged offenses benefited a criminal gang for the purposes of the alleged gang enhancements.   We reject these contentions and affirm the judgments of conviction.

PROCEDURAL HISTORY

Defendants were charged with multiple counts arising out of robberies committed in Escondido on May 16, 2013.[1]  The three were charged with eight counts of second degree robbery (Pen Code, § 211; counts 1–8) and one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 9).  Garcia and Mendoza were both charged with one misdemeanor count of resisting arrest.  (Pen. Code, § 148, subd. (a)(1);

---

[1]     All further events referenced occurred in 2013 unless otherwise noted.

2

count 10.)  Guzman was charged with a single count of misdemeanor hit and run driving. (Veh. Code, § 20002, subd. (a); count 11.)  The information alleged that Guzman used a deadly weapon in the commission of six of the robberies.  (Pen. Code, § 12022, subd. (b)(1); counts 1–6.)  Mendoza was alleged to have used a deadly weapon in committing the assault and two of the robberies.  (Pen. Code, §§ 12022, subd. (b)(1), 1192.7, subd. (c)(23); counts 7–9.)  The three defendants were alleged to have committed all nine felony counts for the benefit of a criminal street gang.  (Pen. Code, § 186.22, subd. (b)(1); counts 1–9.)  Guzman was alleged to have suffered a juvenile prior strike.  (Pen. Code,[2] §§ 667, subds. (b)–(i), 668 & 1170.12.)

A joint trial by jury began on September 24.  The misdemeanor resisting arrest and hit and run charges were dismissed on motion from the prosecution.  On October 8, the jury found defendants guilty on all remaining charges and found true all the gang and weapons-use allegations.  In a bifurcated bench trial held on October 15, the court found the juvenile strike prior against Guzman true.  Defendants were sentenced on December 5.  Guzman was sentenced to total determinate term of 26 years four months in prison. The court sentenced Mendoza to 23 years in prison.  Garcia was sentenced to 17 years four months imprisonment.

FACTUAL SUMMARY

A.  Robbery at the Mi Pueblo Market

On May 16, a group of teenage boys, Ruben V., Juan L., Luis D., Jonathan R.,

---

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

3

David O., and Carlos F. were skateboarding in the parking lot of an abandoned Mi Pueblo Market in Escondido. The shopping center was located near a flood control channel. The channel runs throughout Escondido and is frequently used by gang members as a pathway. While the youths were skating, they left their backpacks and other personal belongings up against a nearby wall. Most of the skaters were taking a break from skateboarding and lying up against the wall when defendants Mendoza, Guzman, and Garcia jumped over a nearby fence and approached the skaters. The trio approached the skaters and immediately began picking up the skaters' backpacks. Jonathan and Juan were about five to six feet away from the rest of their group and still skateboarding when the robbery began.

Jonathan thought he heard somebody say, "Empty out your pockets." Guzman pulled a hammer from his waistband and held it in a threatening manner while he picked up some of the backpacks. While wielding the hammer, Guzman demanded David hand over his cell phone, and David complied. Guzman also took Juan's and Jonathan's cell phones, which had been left lying by the wall. Luis ran away when he saw the hammer, leaving his cell phone and headphones on top of Ruben's backpack. Carlos attempted to leave with his backpack and skateboard, but Guzman knocked Carlos's skateboard out of his hands and seized his wallet and backpack. Juan asked for his phone back from Guzman, to which Guzman replied, "Fuck you, it's mine now," while brandishing the hammer as if he was going to hit Juan. After that exchange, Juan and Jonathan fled the scene on their skateboards. After taking the skaters' belongings, the three defendants

4

jumped back over the fence. The skaters left the scene for a nearby Walgreens and called 911.

B. Robbery on Mission Avenue

Daniel M. and Abraham D. were skateboarding down the sidewalk on Mission Avenue, approximately two miles away from the abandoned market and approximately half an hour after the robbery. They were both listening to music through headphones as they skated; Daniel was about 10 feet ahead of Abraham. Mendoza jumped out in front of Abraham, forcing Abraham to jump off his skateboard. Daniel, who was skating ahead of Abraham, stopped when he realized he could no longer hear Abraham skating behind him. Daniel turned around, seeing a man standing in front of Abraham. Daniel got off his skateboard and was approached by Garcia, who said to Daniel, "Give me your shit." Daniel unplugged his headphones, and Garcia yanked them out of Daniel's shirt. Garcia then walked towards Abraham and took Abraham's skateboard.

Mendoza and Guzman had surrounded Abraham when Garcia joined them. Mendoza took a swing at Abraham with his fist, grazing Abraham's cheekbone. Mendoza then took a hammer out of his waistband and demanded Abraham hand over his cell phone. Abraham refused, and Mendoza swung the hammer at Abraham; however, Mendoza pulled his arm back as if he injured his arm and did not strike Abraham. Mendoza returned the hammer to his waistband and then reached into Abraham's pocket for the phone. Abraham took a step back, and Mendoza threatened to hit Abraham with the hammer if he did not comply. Abraham finally allowed Mendoza to take his phone.

5

After the robbery, the three defendants got into an old gray Honda with a broken back window and drove away. Shortly after the robbery, Abraham made a 911 call using Daniel's cell phone.

C. Traffic Stop

Approximately five hours following the robberies, Escondido police officers from the Gang Enforcement Team ("GET") attempted to stop a gray Honda with a broken rear window in an area considered Diablos gang territory. The car had four persons inside of it. After spotting the car, the officers confirmed the license plate number matched that of the getaway car described by Abraham. The driver refused to stop, and police pursued the car into the parking lot of an apartment complex, where the driver and passengers bailed out of the still moving car and attempted to escape on foot. Police apprehended Garcia, Mendoza and Guzman as they attempted to flee. Inside the Honda, police found a hammer, backpacks, cell phones and cell phone chargers. Ruben's backpack and its contents were recovered, as were Luis's cell phone and headphones. Carlos's wallet, with his school identification card still inside, was also found in the car. The police recovered Juan's backpack from the car, but not his cell phone. No items taken from David, Daniel or Abraham were found in the car.

D. Identification

After stopping the gray Honda, police contacted Daniel and Abraham and transported them to the apartment parking lot for a curbside lineup at around midnight. Daniel did not recognize any of the three men presented to him, but Abraham identified

6

all three men as being his assailants. Both Daniel and Abraham did recognize the gray

Honda as the vehicle their assailants used in driving away from the robbery.

After the curbside lineup, police prepared three separate six-pack photo arrays to

show the victims of the earlier marketplace robbery. The photos were shown to the

victims the day after the robbery. Ruben, Jonathan and Carlos recognized Guzman as the

robber who wielded a hammer. Luis did not recognize anyone in the photo arrays.

At trial, Ruben initially did not identify Guzman as the robber wielding the

hammer, but he positively identified Guzman on the second day of trial. Juan also

identified Guzman in court as the robber with a hammer. Jonathan and David did not

recognize any of the defendants at trial. Juan recognized Mendoza as being one of the

robbers; however, Juan did not identify Garcia as the third robber. Juan stated that the

third robber was someone that he went to school with and that he did not see him in

court. Carlos identified all three defendants in court, stating that Mendoza was the robber

who wielded the hammer. Abraham identified all three defendants in court, specifically

identifying Mendoza as the man who wielded the hammer. Daniel was unable to identify

any of the defendants in court.

## DISCUSSION

### I.

### Trial Court's Refusal to Bifurcate Proof of the Gang Enhancement

Prior to trial, Mendoza moved to bifurcate trial of the gang enhancement.

Guzman's counsel expressly joined the motion, and the trial court had ruled that it would

7

deem an objection, and implicitly a motion, made by one defendant as made by all defendants.  The trial court denied the motion.  We find no abuse of discretion.

Our courts have consistently recognized the efficiencies that are achieved by way of a joint trial of related matters.  (See, e.g., *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 (*Hernandez*).)  Thus, in order to prevail on a motion to bifurcate a gang enhancement, a defendant must " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' "  (*Ibid*.)  "In cases not involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal.  [Citation.]  But evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.  [Citations.]  To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary.  [Citation.]"  (*Id.* at pp. 1049–1050.)

"Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself . . . a court may still deny bifurcation."  (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.)  The court in *Hernandez* noted that a "trial court's discretion to deny bifurcation of a charged gang enhancement is

8

. . . broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid*.)

In *Hernandez*, the court found that much of the gang evidence presented in that case was relevant to the charged offense, specifically on the issues of motive and intent. (*Hernandez, supra*, 33 Cal.4th at p. 1051.) The court acknowledged that some evidence of prior criminal acts by the defendants' fellow gang members and some of the expert testimony would not have been admissible at a trial that was limited to the charged offenses; however, the court found that the otherwise inadmissible evidence was nonetheless somewhat probative and not highly inflammatory as compared to the other gang evidence, which would have been admissible even in a separate trial of the substantive offense. Accordingly, the court found that the defendants had not shown any substantial danger of prejudice. (*Ibid*.)

Here, evidence of defendants' robbery spree was relevant and probative not only with respect to the gang enhancement but also with respect to their motive in committing the robberies and, in particular, establishing Garcia's role and motive in assisting Guzman and Mendoza. Thus, much of the evidence related to the gang enhancement would have been admissible in a separate trial of the robberies. Moreover, the gang evidence was not any more inflammatory than the victims' testimony about the robberies. Under these circumstances, the trial court did not abuse its discretion in denying the motion to bifurcate.

## II.

### Admission of Identification Evidence

Defendants challenge the admissibility of the curbside lineup in which Abraham identified each of them and both he and Daniel identified the Honda. Defendants also challenge the "six-pack" photographic lineups. Defendants argue that, in each instance, the identification procedures were unduly suggestive and prejudicial.

A. *General Principles*

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]

"The defendant bears the burden of demonstrating the existence of an unreliable identification procedure. [Citations.] 'The question is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 989-990.) "Moreover, there must be a 'substantial likelihood of irreparable misidentification' under

10

the ' " 'totality of the circumstances' " ' to warrant reversal of a conviction on this ground."

(*Ibid.*)

B. *Curbside Lineup*

Defendants, who were identified by Abraham at the curbside lineup, but not by Daniel, argue the lineup was unduly suggestive because within six hours after Daniel and Abraham were robbed, police called them, advised them that they had caught the robbers, and took them to a curbside lineup. Like the trial court, we do not find that the circumstances under which the lineup was conducted were unduly suggestive.

1. Rationale for Curbside Lineups

"[A]lthough a one-person showup may pose a danger of suggestiveness, such showups 'are not necessarily or inherently unfair. [Citations.] Rather, all the circumstances must be considered.' [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 753.) For an identification procedure to violate a defendant's due process rights, "the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*People v. Ochoa* (1998) 19 Ca1.4th 353, 413.) However, "[s]ingle-person show-ups for purposes of in-field identifications are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. [Citation.] The law permits the use of in-field

11

identifications arising from single-person show-ups so long as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 387, italics omitted; see *In re Richard W.* (1979) 91 Cal.App.3d 960, 970; *People v. Irvin* (1968) 264 Cal.App.2d 747, 759.)

2. Witness Testimony

On direct examination, Abraham explained that police called his home and told him that "they had caught the guys." However, at that point, Abraham was not told that he would be asked to identify anyone at a curbside lineup. Later, a police officer came to Abraham's house and explained that she was going to take him to a curbside lineup. After Abraham and his mother were in the officer's patrol car, but before leaving Abraham's home, the police officer read him an admonishment, which advised Abraham that he should not infer any guilt just because someone had been detained, that he did not have to identify anyone and that it was just as important to free an innocent person as identify someone involved in a crime.[3]

According to Abraham, he understood that he was going to the curbside lineup so

---

[3] The officer read the admonishment from a card provided to her by the Escondido Police Department. The card stated: "I want you to look at someone we have detained. Don't conclude from the fact that we have detained someone that he or she is the guilty party.

"You are not obligated to identify anyone. It is just as important to free an innocent person as it is to identify the involved party.

"Be aware that sometimes people who commit crimes will try to disguise their appearance by changing clothes, wearing hats, sunglasses or wigs.

"Don't say anything or make any gestures by nodding or pointing, et cetera, until you have totally viewed the person. Do you understand?"

that he could "[n]otify the cops *if* those were *the correct* guys." (Italics added.) Abraham stated that he was able to identify Mendoza as the one who stole his cell phone based on his recollection of the robber's facial features, clothes, height and weight and physical build; Abraham was able to identify Garcia as the one who robbed Daniel based on his recollection of the second robber's clothes and height; and Abraham was able to identify Guzman as the getaway driver based on his recollection of the driver's long straight hair.

Daniel testified that he also received a call from Escondido police officers in which he was told that the police had stopped some people they thought might be involved in the robbery. Daniel was given the same admonishment provided to Abraham. As we have indicated, Daniel was unable to identify any of the defendants as one of the robbers, but he did recognize the Honda as the getaway car.

3. Analysis

In sum, before asking the two victims to identify the defendants, each victim was admonished that they were not to infer guilt from the fact that any of the individuals were detained and that they were not obligated to identify anyone. The admonishment was effective with both Abraham, who testified that he understood his role was to notify the police "*if* they were the *correct* guys," (italics added) and Daniel, who plainly felt no suggestion or pressure because he was unable to identify any of the defendants as suspects but did recognize the Honda as the getaway car. Given these circumstances in the record, which show that the witnesses acted independent of any suggestion or pressure that may have been expressed or inherent in the circumstance, defendants did

13

not meet their burden of showing that the statements the police made to the witnesses before the lineup were unduly suggestive or that the identification Abraham made six hours after the robbery was in any way unreliable.

C. *Six-pack Photo Lineup*

1. The Lineup

Six of the victims at the Mi Pueblo Market robbery were shown three separate six-pack photo lineups (six-pack); each six-pack included a picture of one of the defendants. The six-packs were prepared with the assistance of a computer program that selected photographs of individuals with physical characteristics similar to each of the defendants and organized the photographs randomly.

The six-packs were shown to the six victims at Ruben's house. Ruben testified that he was told by the police that they had recovered various items and that three people were in custody. However, each victim was admonished that they did not have to identify anyone in the lineup and that they should not assume that anyone whose picture was in the lineup was in custody. Each victim was shown the six-packs separately. Three of the victims—Ruben, Jonathan, and Carlos—were able to identify Guzman; only two of the victims—Ruben and Carlos—were able to identify Mendoza; none of the victims was able to identify Garcia.

2. Analysis

Guzman argues that because only one other person in the six-pack, which included his photograph, had long hair, it was unduly suggestive. "However, 'there is no

requirement that a defendant in a lineup be surrounded by people nearly identical in appearance [citations] . . . .' [Citations.] Thus, courts have upheld lineup identifications despite the existence of similar or greater disparities among the lineup participants. [Citation.]" (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 790; see *People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052-1053.) Because the Guzman six-pack included one other person with long hair and only three of the victims were able to identify him, plainly the lineup was not unduly suggestive.[4]

The fact that Mendoza was only identified by two of the six victims also strongly suggests that neither the six-pack that included him nor the circumstances surrounding the identification were in any manner suggestive. With respect to the overall circumstances in which the six-packs were presented, and any statements the police made with respect to the status of any of the perpetrators, the fact that none of the six victims identified Garcia further demonstrates that those circumstances and statements were in no sense overly suggestive.

In sum, defendants did not meet their burden with respect to the six-pack lineup identification.

III.

Trial Court Instructions on Gang Enhancement

The trial court instructed the jury with CALCRIM Nos. 252 and 1401, which

---

4 Because the Guzman six-pack was not overly suggestive, Ruben's later use of it when he eventually identified Guzman at trial, after initially being unable to do so, did not in any manner infringe on Guzman's due process rights.

15

taken together advised the jury that the gang enhancements under section 186.22, subdivision (b) required proof that in committing the robberies the defendants acted with the specific intent to "promote, further and assist in criminal conduct by gang members." Contrary to defendants' argument on appeal, the enhancements alleged under section 186.22, subdivision (b) do not require a showing that defendants also *knew* they were assisting gang members. Rather, by its terms, the only mens rea required to establish the gang enhancement is proof of an intent to promote, further or assist a crime or crimes committed by gang members.

In this sense, the enhancement set forth in section 186.22, subdivision (b), which requires proof that an underlying crime was related to gang activity and proof of an intent to assist in committing the crime, is to be distinguished from the substantive crime of active gang participation, proscribed by section 186.22, subdivision (a), which by its terms requires *knowledge* by a defendant that he or she has been assisting the criminal conduct of a gang with a pattern of street crime. (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138 (*Rodriguez*).)

We recognize that in *People v. Albillar* (2010) 51 Cal.4th 47, 54-59 (*Albillar*), the court held that under section 186.22 subdivision (a) knowledge that participants in a crime are members of a criminal street gang must be established, but no proof that a particular crime was gang related is required. However, nothing in *Albillar* imports into the separate enhancement set forth in section 186.22 subdivision (b) a scienter or knowledge requirement.

16

IV.

Jury Instructions Regarding Intent and Motive

The trial court instructed the jury with a version of CALCRIM No. 1401, which required that in order to find true the gang enhancement, the jury was required to find that the predicate crime or crimes were committed for the benefit of or in association with a gang and that the defendant intended to assist criminal conduct by gang members. The trial court also provided the jury with a version of CALCRIM No. 1403, which limited the use of gang-related evidence to the issues of: intent, purpose and knowledge required to prove the gang-related enhancements and a motive for commission of the underlying substantive crimes. Finally, over the objection of defendants, the jury was instructed with CALCRIM No. 370, which stated that the prosecution did not have to prove defendants had any motive for committing the charged crimes but that, in reaching their verdict, the jury could consider whether the defendants had a motive.[5]

---

[5]     The version of CALCRIM No. 1401 that was provided to the jury stated:
       "If you find the defendant guilty of the crimes charged in Counts 1 through 9, you must then decide whether the People have proved the additional allegation that the defendant committed each of those crimes for the benefit of, at the direction of, or in association with a criminal street gang.
       "To prove this allegation, the People must prove that:
       "1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang;
       "AND
       "2. The defendant intended to assist, further, or promote criminal conduct by gang members.
       "A *criminal street gang* is any ongoing organization, association, or group of three or more persons, whether formal or informal:
       "1. That has a common name or common identifying sign or symbol;
       "2. That has, as one or more of its primary activities, the commission of Robbery or Attempted Robbery (Penal Code section 211), Assault with a Deadly Weapon or Force

17

Likely to Cause Great Bodily Injury (Penal Code section 245), Attempted Murder (Penal Code section 664/187).

"AND

"3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.

"In order to qualify as a *primary* activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"A *pattern of criminal gang activity*, as used here, means:

"1. The commission of, or attempted commission of, or conspiracy to commit, or solicitation to commit, or conviction of:

"any combination of two or more of the following crimes, or two or more occurrences of one or more of the following crimes: Robbery or Attempted Robbery (Penal Code section 211), Assault with a Deadly Weapon or Force Likely to Cause Great Bodily Injury (Penal Code section 245), Attempted Murder (Penal Code section 664/187).;

"2. At least one of those crimes was committed after September 26, 1988;

"3. The most recent crime occurred within three years of one of the earlier crimes;
"AND

"4. The crimes were committed on separate occasions or were personally committed by two or more persons.

"The crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related.

"The People need not prove that the defendant is an active or current member of the alleged criminal street gang.

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved.

"You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

The version of CALCRIM No. 1403 that was provided to the jury stated:

"You may consider evidence of gang activity only for the limited purpose of deciding whether:

"The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged;

"OR

"The defendant had a motive to commit the crimes charged.

18

Defendants objected to CALCRIM No. 370 on the grounds that, given in conjunction with CALCRIM No. 1403, it would cause the jury to confuse the intent required to prove the gang enhancements with the separate mental state of motive. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) They renew this argument on appeal. Like the court in *People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1139-1140, we find no merit in this argument. The instructions, as given, adequately distinguish the intent the jury must find from evidence of motive that might be relevant in determining whether the defendant acted with the required intent. (See *ibid*.)

V.

Sufficiency of the Evidence to Support Gang Enhancements

A. *Background*

Defendants allege the prosecution failed to present substantial evidence to support the true findings with respect to the gang enhancement allegations under section 186.22,

---

You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

The version of CALCRIM No. 370 that was provided to the jury stated:

"The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive.

"Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

19

subdivision (b). At the time they were arrested, Garcia was a documented member of the Eastside gang in San Diego, California. Guzman and Mendoza were documented members of the Diablos gang in Escondido, California.

Gang experts testified that not all Hispanic criminal street gangs in San Diego County are rivals. The experts testified that both the Eastside gang in San Diego and the Diablos in Escondido are "eastside" Hispanic street gangs. Escondido Police Detective Gregory Clark testified specifically regarding the Diablos gang. He testified that the Diablos frequently use a cement flood control channel in the city to move around and evade police. The robbery at the Mi Pueblo Market occurred near the Escondido flood control channel.

Clark testified the Diablos frequently commit crimes against members of the public in their home turf and tend to do this more frequently than other Escondido street gangs. He testified such crimes benefit the gang by instilling fear within the surrounding community. Members of the Diablos gang are expected to automatically back up their fellow gang members if a member decides to commit a crime of opportunity against a member of the public. No orders are given, and no words are necessary for the backup to occur. Citing to specific examples of crimes committed by Diablos gang members, Clark opined that the primary purpose and activity of the Diablos gang is to commit crimes such as robbery, assault with a deadly weapon, and making criminal threats.

In response to hypotheticals modeled after the charged robberies and assaults, Clark testified the crimes benefited the Diablos gang because they were a continuation of

the Diablos's campaign of victimizing persons on their home turf and spreading fear of the gang in the area. Clark also said the individual gang members would benefit by increasing their reputation within their gangs for their willingness to commit violent crimes.

Significantly, the presence of a San Diego Eastside gang member among the trio did not change Clark's opinion that the crime benefited the Diablos gang. In Clark's opinion, this was evidence the Eastside gang member was aligned with the Diablos, that the Diablos gang members he was working with could count on him and that he was working to benefit the Diablos gang.

B. *Standard of Review*

On review, the question of whether the prosecution presented sufficient evidence to support a gang enhancement under section 186.22, subdivision (b)(1) is a question of fact reviewed under the substantial evidence standard. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484.) When applying the substantial evidence standard, "the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if

21

it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  [Citation.]" '  [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

  C.  *Gang Enhancement*

  Section 186.22, subdivision (b)(1) enhances the sentence of " 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct *by gang members*.' "  (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1139, italics added.)  Thus, "[t]he enhancement set forth in section 186.22(b)(1) does not . . . depend on membership in a gang at all.  Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent *to aid members of that gang*."  (*Albillar*, *supra*, 51 Cal.4th at pp. 67-68, italics added.)  In *Albillar*, the court reached this conclusion in rejecting the defendants' contention that the prosecution had to show that a defendant had the specific intent to aid the identified gang.  Rather, the prosecution is only required to show that the crime committed by a defendant was gang related in the sense that it is committed at the direction of, in association with or for the benefit of a criminal street gang.  (*Id.* at p. 60.)

22

Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in "association" with a gang. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) A crime is committed in association with a gang if the "defendants relied on their common gang membership and the apparatus of the gang in committing" the charged felonies. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) For example, three criminal street gang members who raped and sexually assaulted a 16-year-old girl were found to have committed the crime in association with a gang because as fellow gang members they were able to rely upon each other to help facilitate the sexual assaults, they could expect their fellow gang members not to talk to the police, and they relied upon their membership in the gang to intimidate the victim. (*Id.* at pp. 61-62.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 (*Villalobos*).) Importantly, the prosecution must prove that the gang meets section 186.22, subdivision (f)'s definition of a criminal street gang. "[T]he prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses')

23

during the statutorily defined period." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

Generally, for the purposes of proving the gang enhancement, an expert witness is permitted to testify regarding the culture, habits, and psychology of criminal gangs. The expert, in response to a hypothetical question modeled after the alleged crime, may opine as to the motivation for the defendant's actions if the opinion falls within the witness's expertise regarding the culture of criminal gangs. (*People v. Ward* (2005) 36 Cal.4th 186, 210.) However, a "crime may not be found gang related . . . based solely upon the defendant's criminal history and gang affiliations. The crime itself must have some connection with the activities of a gang." (*People v. Martinez* (2004) 116 Cal.App.4th 753, 761, italics omitted.)

"Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322.) An expert's opinion that a crime benefited a gang by enhancing its reputation for "viciousness" or violence may be sufficient to raise an inference that the crime benefited the criminal gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63; *Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1139; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 353.)

D. *Discussion*

To prevail under the substantial evidence standard, defendants must demonstrate

that no reasonable fact finder could have found true the alleged gang enhancement. To prove the gang allegations, the prosecution had to demonstrate the existence of a criminal street gang. As defined by statute " 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts . . . having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) The prosecution must also show that the gang "includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period." (*Gardeley*, *supra*, 14 Cal.4th at p. 617.)

Here, Detective Clark provided testimony regarding the Diablos gang in Escondido, including specific examples of predicate offenses committed by the gang. Thus, with respect to the Diablos, the prosecution met its burden of showing that it was a criminal street gang. However, expert witnesses did not testify to predicate offenses committed by the Eastside gang in San Diego, and, thus, there was insufficient proof the San Diego Eastside gang is a criminal street gang for the purposes of the gang enhancement.

Having established the existence of a gang, the prosecution was then required to show that the individual defendants committed felony crimes " 'for the benefit of, at the

25

direction of, *or* in association with [the] criminal street gang, with the specific intent to promote, further, *or* assist in any criminal conduct by gang members.' " (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1139, italics added.) In this case, there is substantial evidence to support an inference that defendants committed the crimes in association with the Diablos street gang and that they had a specific intent to assist in criminal conduct by Diablos gang members: Mendoza and Guzman were known members of the Diablos gang, and there is sufficient evidence to draw an inference that they relied upon their gang membership in conducting the robberies. It can be reasonably inferred based upon expert testimony and the circumstances of the crimes that Mendoza and Guzman knew that, as fellow Diablos gang members, they could count on each other to assist when engaging in crimes of opportunity against victims in their territory and could count on the other gang members' silence if confronted by the police.

While Garcia is a documented member of a different gang in a different part of San Diego County, this fact would not prevent a reasonable fact finder from nonetheless finding that he committed the armed robberies in association with and for the benefit of the Diablos. Our state high court's recent ruling in *People v Prunty* (2015) 62 Cal.4th 59, 71-72 (*Prunty*)[6] does not foreclose the possibility of such a conviction, because while

---

6       In *Prunty* the court stated:
       "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or

expert witnesses did not submit evidence proving that the Eastside gang is either a criminal street gang or a subset of a larger criminal gang to which both Eastside and the Diablos are associated, section 186.22, subdivision (b) does not require that a defendant be a member of a criminal street gang, only that the defendant commits a felony either to benefit a gang, or in association with a gang and that the defendant has a specific intent to aid gang members in the commission of a felony. (*Albillar*, *supra*, 51 Cal.4th at pp. 67-68.)

Garcia worked with the Diablos gang members in the armed robberies, and they apparently relied upon and trusted him as if he were one of them. An expert witness also testified that there was a great deal of crossover between Hispanic criminal street gangs in San Diego County. Given these facts, a reasonable jury could have inferred that Garcia committed the armed robberies in association with and support of the Diablos even if he was not formally a member of that organization. The fact that the armed robberies occurred in Diablos territory and armed robbery of members of the public is a

---

work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization.

"Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22(b). But it is not enough, as the Court of Appeal in this case held, that the group simply shares a common name, common identifying symbols, and a common enemy. Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group." (*Prunty*, *supra*, 62 Cal.4th at pp. 71-72, fns. omitted.)

27

crime that was identified by an expert witness as one of the primary criminal activities of the Diablos gang support a strong inference that all three defendants committed the armed robberies with the intent of assisting Diablos gang members in conducting criminal activity, thus satisfying both prongs of section 186.22, subdivision (b).

Because the record shows in a fairly convincing fashion that the Diablos is a criminal street gang and, further, that all three defendants were acting on behalf of the Diablos, there was sufficient evidence to sustain the jury's true finding under section 186.22, subdivision (b).

## DISPOSITION

The judgments of conviction are affirmed.


BENKE, Acting P. J.

WE CONCUR:


NARES, J.


IRION, J.