Filed 12/7/21  P. v. Ross CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075578 |
| v. | (Super. Ct. No. FSB1500312) |
| NICHOLAS ROSS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Dwight W. Moore, Judge.  Affirmed.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

A jury convicted defendant and appellant Nicholas Ross of carjacking (Pen. Code, § 215[1]; count 1) and second degree robbery (§ 211; count 2). The trial court sentenced him to a term of 20 years plus an indeterminate term of 25 years to life.

On appeal, defendant contends his conviction must be reversed for evidentiary, instructional, and cumulative error. He also argues his sentence was improperly imposed and amounts to cruel and unusual punishment. We find no error and affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Around 10:45 p.m., C.F. and his girlfriend, D.S., were sitting in his parked car, a silver Acura, when a man approached them while pointing a handgun at C.F. The man opened the driver's door, told C.F. to "get running," and grabbed C.F.'s cell phone off of his lap. C.F. and D.S. got out of the car and ran to a nearby store to call C.F.'s sister, who picked them up within five minutes. After dropping off D.S., C.F. went home and called 911.

San Bernardino Police Officer Steven Kaufer responded in five to 10 minutes. C.F. told Officer Kaufer that his car was a silver Acura. He described the assailant as a thin Hispanic man, about 5'7", and wearing a black hat, black t-shirt, gloves, and a bandana with white markings covering his face.

_____

[1] All further statutory references are to the Penal Code.

2

Less than an hour later, San Bernardino Police Officer Christopher Emon saw a silver Acura parked at an intersection that matched C.F.'s description of his car. The car's hood was up, its doors were open, and a man was rummaging through the trunk. The man was wearing a black t-shirt, dark pants, and a hat.

When the man saw Officer Emon, he began running. Officer Emon chased after the man and apprehended him. The man had a black bandana with white markings on it and an empty gun holster on his belt. Officer Emon located a gun nearby, which fit in the man's gun holster. Officer Emon also found C.F.'s stolen cell phone in a bag in the front seat of the Acura.

Shortly after midnight, Officer Kaufer learned that Officer Emon had arrested a suspect and took C.F. to an in-field identification at the scene of the arrest. Before arriving, Officer Kaufer told C.F.: "'We are detaining a person who may or may not have committed the crime. You are under no obligation to identify anyone. If there are any similarities between the person detained and person who committed the crime, please tell me about them. Please advise me whether or not this person is the person who committed the crime.'"

When they arrived, defendant was standing next to a patrol car. Officer Emon stopped about 20 feet away and turned his spotlight on defendant. C.F. immediately said, "'That is the guy.'" C.F. recognized defendant's bandana and hat, as well as the gun Officer Emon found. C.F. also identified his cell phone found in his Acura. C.F. was "100 percent certain" defendant carjacked him.

3

A jury convicted defendant of one count of carjacking (§ 215; count 1) and one count of second degree robbery (§ 211; count 2). The jury found true the special circumstance allegations that defendant personally used a handgun in the commission of the offenses (§ 12022.53, subd. (b)) and that the offenses are serious and violent felonies (§§ 1192.7, subd. (c)(8), 667.5, subd. (c)(8)). The trial court found true the allegations that defendant had suffered two strike priors (§§ 1170.12(a)-(d), 667(b)-(i)), two prior serious felonies (§ 667(a)(1)), and one prison prior (§ 667.5(b)), which the court dismissed before sentencing.

After denying defendant's *Romero*[2] motion, the trial court sentenced defendant to a five-year term plus 25 years to life on count 1, a 10-year term for the firearm enhancement, and a 10-year term for defendant's prior serious felonies. The trial court stayed the sentence on count 2 under section 654.

III.

DISCUSSION

Defendant raises seven claims of error on appeal: (1) the trial court improperly admitted evidence of C.F.'s in-field identification; (2) the trial court erroneously instructed the jury with CALCRIM No. 315; (3) the trial court erroneously instructed the jury on defendant's flight from the crime scene; (4) the trial court improperly discouraged the jury from asking questions or requesting a readback of testimony; (5) the trial court

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

4

erroneously denied his *Romero* motion; (6) his sentence is cruel and unusual; and (7) cumulative error requires reversal. We reject defendant's contentions.

A. *In-Field Identification*

Before trial, defendant moved in limine to exclude C.F.'s in-field identification of him. He claimed that it was unduly suggestive and its admission would violate his due process right to a fair trial. The trial court denied the motion. We find no error.

"[T]o determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

"For an identification procedure to violate a defendant's due process rights, 'the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure.' [Citation.] However, '[s]ingle-person show-ups for purposes of in-field identifications are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the

5

interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. [Citation.] The law permits the use of in-field identifications arising from single-person show-ups so long as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' [Citations.]" (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1359.)

"We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943.)

Nothing about C.F.'s in-field identification of defendant was unduly suggestive. Before asking C.F. to identify defendant, Officer Kaufer told C.F. only that (1) police had detained someone "who may or may not have committed the crime," (2) C.F. did not have to identify anyone, (3) C.F. should identify "any similarities" between the detainee and the person he believed committed the crime against him; and (4) C.F. should tell Officer Kaufer whether the detainee was the person he believed committed the crime. When C.F. saw defendant, he immediately identified defendant by his clothing and appearance and said he was "100 percent certain" about his identification.

Under these circumstances, the in-field identification procedures were not "'so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' [Citations.]" (*People v. Garcia*, *supra*, 244 Cal.App.4th at p. 1359.) We therefore need

6

not determine whether C.F.'s identification of defendant was reliable, and conclude the trial court did not err in admitting evidence of it. (*People v. Alexander* (2010) 49 Cal.4th 846, 902 ["'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.'"].)

B. *CALCRIM No. 315*

The trial court instructed the jury with CALCRIM No. 315, which directed the jury to consider a number of questions to evaluate an eye witness's testimony, including "[h]ow certain was the witness when he or she made an identification?" Defendant contends this particular question violated his due process rights because it impermissibly allows juries to equate an eye witness's certainty with the witness's accuracy.

The People assert defendant forfeited the argument by failing to object to CALCRIM No. 315 below. We agree. (See *People v. Sanchez* (2016) 63 Cal.4th 411, 461-462 [defendant forfeited argument that instruction improperly directed jurors to consider eye witness's certainty by failing to object to it in the trial court]; accord, *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199-200 ["Rodriguez argues CALCRIM No. 315 violates his Fourteenth Amendment due process rights because it tells the jury to consider eyewitness certainty. Rodriguez's counsel did not object at trial. This is forfeiture."].)

In any event, our Supreme Court recently held that instructing the jury with CALCRIM No. 315 does not violate a defendant's due process rights. (See *People v.*

*Lemcke* (2021) 11 Cal.5th 664.) We therefore reject defendant's argument that the trial court prejudicially erred by giving CALCRIM No. 315.

C. *Flight Instruction*

The trial court instructed the jury with CALCRIM No. 372, which provides in relevant part: "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he or she was aware of his or her guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself." Defendant contends the trial court erred in giving the flight instruction. We disagree.

The flight instruction was proper. "'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.]'" (*People v. Leon* (2015) 61 Cal.4th 569, 607 (*Leon*).)

For instance, in *Leon*, the California Supreme Court held the trial court properly instructed the jury on flight when the defendant was charged with evading a police officer with willful disregard for safety and robbery murder. (*Leon*, *supra*, 61 Cal.4th at p. 607.) The court reasoned that the defendant's flight was relevant to his consciousness of guilt for both offenses. (*Ibid.*)

*Leon* controls here. Defendant's flight from Officer Emon was relevant to his consciousness of guilt for the charges. The trial court therefore did not err in giving

8

CALCRIM No. 372.  (See *Leon*, *supra*, 61 Cal.4th at p. 607; see also *People v. Henry* (1937) 23 Cal.App.2d 155, 165 [jury instruction on flight proper because defendant's flight was relevant to defendant's consciousness of guilt].)

Finally, we disagree with defendant that CALCRIM No. 372 is "improperly argumentative," conflicts with section 1127c, lessened the prosecution's burden, undermined the presumption of defendant's innocence, or allowed the jury to find him guilty based on his flight from the crime scene.  Courts have consistently rejected these arguments and held that CALCRIM No. 372 is properly given to the jury when, as here, there is substantial evidence that the defendant fled the scene of a crime.  (See e.g., *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30 [rejecting arguments that CALCRIM No. 372 undermines the presumption of innocence or lowers the prosecution's burden]; *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158-1159 [rejecting argument that CALCRIM No. 372 allows jury to "presume[] the existence of" the defendant's guilt from his flight]; *People v. Price* (2017) 8 Cal.App.5th 409, 454 [rejecting arguments that CALCRIM No. 372 is "impermissibly argumentative" and conflicts with section 1127c].)  We agree with these decisions and follow them here.

As a result, we conclude the trial court did not err by instructing the jury with CALCRIM No. 372.

D. *Jury Admonition*

Before the jurors began deliberating, the trial court instructed the jury with CALCRIM No. 202:  "'[I]f there is a disagreement about the testimony at trial, you may

9

ask that the court reporter's record be read to you. It is the record that must guide your deliberations, not your notes. You must accept the court reporter's record as accurate. Please do not remove your notes from the jury room. At the end of the trial, your notes will be collected and destroyed.'"

The trial court then stopped reading the instructions and told the jury: "Now, if you ask to have some testimony re-read or if you send out any kind of question to me, you will get a response. But it may take some time. If it is a request for a readback, we may be doing something else. And my reporter may be busy. She may not be able to do anything until we finish what we are doing. Then she will have to go through her notes, find the appropriate notes, sort through it, and then come in and read it to you. That takes some time. [¶] If you ask any question about the instructions or anything else about the case, I have to round up the attorneys, herd them into the courtroom, talk to them about it before I can respond to you. And that can take time. They are elusive people. And so if you ask for anything, you will get a response to it. But it may take some time. So please continue your deliberations to whatever extent you can while you are waiting for a response from me."

Defendant contends this "departure from the standard jury instructions was error." He claims it violated section 1138 and his federal constitutional rights because it coerced the jury not to ask questions or request readbacks of testimony, and the jury neither asked a question nor requested a readback. We disagree.

10

Under section 1138, "the jury has a right to rehear testimony and instructions on request during its deliberations." (*People v. Frye* (1998) 18 Cal.4th 894, 1007.) The trial court did not violate section 1138 by explaining to the jurors that it "may take some time" to answer their questions or to give them a readback of testimony. In line with section 1138, the trial court explicitly told the jury, "if you ask for anything, you will get a response to it." (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 506 ["[T]he court did not violate section 1138. It did not refuse to provide any rereading of testimony; indeed, the jury did not request any."]; *Id.* at p. 506 ["Merely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion."] *Ibid.*)

The trial court also did not violate defendant's federal constitutional rights by explaining to the jurors why they may not get an immediate response to a question or readback request. When viewed in context, the trial court simply told the jury that it "may take some time" for the court to answer a question or provide a readback because of the logistics involved. The trial court did not suggest to the jury that it should not ask questions or request readbacks, but instead told the jury that "if you ask for anything, you will get a response to it." The trial court's instruction was proper. (See *People v. Hillhouse*, *supra*, 27 Cal.4th at pp. 506-507 ["Merely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion. [Citation.] We see no violation of the . . . defendant's right to have the jury provided a rereading of testimony on request."].)

11

E. Romero *Motion*

Defendant contends the trial court erred by denying his *Romero* motion to strike his two prior strike convictions. We disagree.

1. *Legal Principles and Standard of Review*

"As the Supreme Court explained in *Romero*, section 1385 permits a trial court to strike an allegation of a prior felony conviction in cases brought under the "'Three Strikes'" law, in the interests of justice." (*People v. Thimmes* (2006) 138 Cal.App.4th 1207, 1213, citing *Romero*, *supra*, 13 Cal.4th at pp. 529-530.) "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation . . . the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

The purpose of the Three Strikes law is "'to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious or violent felony offenses.'" (§ 667, subd. (b).) The Three Strikes law "establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike," unless the trial court determines the defendant falls outside the scheme's spirit. (*People v. Strong* (2001) 87 Cal.App.4th 328,

337-338.) "[E]xtraordinary must the circumstance be by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack." (*Id.* at p. 338.) Thus, the Three Strikes law "not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm." (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)

"The trial court is not required to state reasons for declining to exercise its discretion under section 1385." (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 433.) The trial court "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

A trial court's decision not to strike a prior conviction allegation is reviewed under the abuse of discretion standard. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 371.) "This standard is deferential . . . it asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts." (*People v. Williams*, *supra*, 17 Cal.4th at p. 162.) "Under that standard an appellant who seeks reversal must demonstrate that the trial court's decision was irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions. Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit

of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance." (*People v. Myers*, *supra*, 69 Cal.App.4th at pp. 309-310.)

### 2. *Analysis*

Defendant contends the trial court improperly "refused to consider" the effects of the trauma defendant suffered from the deaths of his siblings when he was a child. He also argues the trial court erroneously based its decision on defendant's current offenses and "what *could* have happened" instead of what happened. In support, he points to the trial court's statement, "[i]f someone had been killed in the course of the carjacking, it could have been a life without the possibility of parole or even a death penalty case. [¶] So saying it could have been worse, well, just about anything could have been worse. I suppose Hitler could have been responsible for more murders than he was. It is hardly a factor in mitigation that he only killed 6,000,000 and not 7. I am not comparing your client to Hitler." Finally, defendant claims the trial court inaccurately described defendant's criminal record as reflecting a "lifetime of crime."

As for defendant's first point, the trial court specifically considered the effect of defendant's siblings' deaths on him when denying his *Romero* motion. The court explained that it read defendant's psychosocial report, as well as a journal article defendant submitted on the traumatic effect a sibling's death can have on a child. The trial court still found that defendant's siblings' deaths were not mitigating factors that justified striking his strike priors.

14

Defendant takes the trial court's Hitler comment out of context to argue that the court inappropriately focused on what could have happened during the commission of defendant's current offenses. Defense counsel argued that defendant's *Romero* motion should be granted in part because "[n]obody was injured" and "[n]obody was killed." The trial court rejected the argument. The court did not, as defendant contends, focus on "what could have happened." Instead, the court found that the fact defendant hurt no one while committing his current offenses and did not commit more serious crimes was not a valid basis to strike his strike priors.

Consistent with *Romero*, the trial court considered defendant's entire criminal history in deciding whether to strike his prior strike convictions. Defendant's criminal history is extensive. He has multiple convictions from between 2004 and 2010, which include assault with a deadly weapon, attempted burglary, and a series of drug offenses. Although defendant may not consider his criminal record to constitute "a lifetime of crime," the trial court permissibly found that defendant does not fall outside the spirit of the Three Strikes law. The trial court therefore did not abuse its discretion in denying defendant's *Romero* motion.

F. *Cruel and Unusual Punishment*

Defendant argues his sentence of 45 years to life is cruel and unusual punishment in violation of the Eighth Amendment and article I, section 17 of the California

constitution.  We disagree.[3]

"A punishment violates the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to the severity of the crime.'  [Citation.]  A punishment may violate article I, section 17 of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'"  (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230-1231.)

"Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.)  In *Rummel v. Estelle*, the United States Supreme Court held a life sentence for credit card fraud of $80, passing a $28.36 forged check, and obtaining $120.75 was not grossly disproportionate in violation of the Eighth Amendment.  Similarly, in *Lockyer v. Andrade* (2003) 538 U.S. 63, the Court upheld two consecutive 25-years-to-life sentences imposed for two thefts of items worth less than $150.  Given that the United States Supreme Court upheld these sentences for minor, non-violent property crimes, it follows that defendant's sentence for carjacking and second degree robbery does not violate the federal constitution.

---

[3]  We agree with the People that defendant forfeited the argument by failing to object to his sentence in the trial court, but we exercise our discretion to address the issue on the merits.  (*People v. Baker* (2018) 20 Cal.App.5th 711, 720.)

Like the federal Constitution, the California Constitution also prohibits the infliction of cruel or unusual punishment. (Cal. Const., art. I, § 17.) A punishment violates the California constitutional prohibition on cruel or unusual punishment "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, superseded by statute on other grounds as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46, 51-52; *People v. Dillon* (1983) 34 Cal.3d 441, 478.) In reviewing an indeterminate sentence such as defendant's, we evaluate whether the maximum term passes constitutional scrutiny irrespective of whether and when defendant may be eligible for parole. (*Baker*, *supra*, 20 Cal.App.5th at p. 724; *In re Lynch*, *supra*, at pp. 416-417.)

To determine whether a sentence is unconstitutionally disproportionate, we apply a three-pronged approach. (*People v. Romero* (2002) 99 Cal.App.4th, 1418, 1431; *In re Lynch*, *supra*, 8 Cal.3d at pp. 425-429.) We (1) examine "'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society,'" (2) "compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction," and (3) "compare the challenged punishment to punishments for the same offense in other jurisdictions." (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296-297.) "Findings of disproportionality are exceedingly rare and occur only in extraordinary cases." (*People v. Wilson* (2020) 56 Cal.App.5th 128, 167.) "Only in the rarest of cases could a court declare that the length of a sentence mandated

17

by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

When evaluating the nature of the offense at the first step, we "consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) We also consider "the particular person before the court, and ask[] whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

Defendant robbed C.F. and D.S. at gunpoint, which "presented a significant degree of danger to society" and suggests his sentence is not disproportionate. (*People v. Em* (2009) 171 Cal.App.4th 964, 972.) His current offenses, which he committed when he was 37 years old, were the most recent of many he has committed, including assault with a deadly weapon and attempted burglary. His recidivism and age also show that his sentence is not cruel or unusual. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1512 ["If increased penalties do not deter the repeat offender, then society is warranted in segregating that person for an extended period of time."]; *Dillon*, *supra*, 34 Cal.3d at p. 479.)

Defendant argues his sentence is cruel and unusual because it is greater than sentences imposed for other, more serious crimes. But "'[p]unishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual.'" (*Baker*, *supra*, 20 Cal.App.5th at p. 727.) Moreover, defendant's sentence was imposed in part because of his criminal history, which includes two strikes. For this reason, the second prong of the disproportionality analysis "is inapposite to three strikes sentencing because it is a defendant's 'recidivism in combination with current crimes that places him under the three strikes law.'" (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1338; see also *People v. Mantanez* (2002) 98 Cal.App.4th 354, 356 [affirming sentence of 25 years to life for repeat offender whose current offenses were for drug possession and receiving stolen property].) Defendant's sentence is not more extreme than the many third-strike sentences for nonviolent crimes California courts have upheld. (See e.g., *In re Coley* (2012) 55 Cal.4th 524, 530 [25 years to life for failure to update sex offender registration was not cruel and unusual]; *People v. Romero*, *supra*, 99 Cal.App.4th at p. 1433 [25 years to life for felony petty theft of stealing magazine]; *People v. Barrera* (1999) 70 Cal.App.4th 541, 555 [25 years to life for check forgery].)

Defendant contends his sentence is unconstitutional because it is disproportionate to the punishment he would have received in other jurisdictions for the same offenses. Although California's Three Strikes scheme may lead to severe sentences, that alone does

not show that defendant's sentence amounts to cruel or unusual punishment. California need not "march in lockstep with other states in fashioning a penal code." (*People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1516.) In any event, defendant's sentence is no more extreme than he would have received in the many other jurisdictions that impose life imprisonment on habitual criminals through recidivist statutes. (See *People v. Cline*, *supra*, 60 Cal.App.4th at p. 1338 [noting nationwide pattern of statutes mandating more severe punishment for recidivist offenders].) "'A comparison of California's punishment for recidivists with punishment for recidivists in other states shows that many of the statutory schemes provide for life imprisonment for repeat offenders, and several states provide for life imprisonment without possibility of parole.' [Citation.]" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 573.)

At bottom, defendant has not shown that his sentence is one of the "exceedingly rare" sentences outside the noncapital context that is cruel or unusual. (*In re Coley*, *supra*, 55 Cal.4th at p. 562.) We therefore conclude defendant's sentence is not cruel or unusual.

G. *Cumulative Error*

Defendant maintains that, taken together, the trial court's errors constitute cumulative error that warrants reversal. We disagree. "A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Because we do not find any error, we also do not find any cumulative error that warrants reversal. (*Ibid.*; see also *People v. Duff* (2014) 58 Cal.4th 527, 562 ["In the

20

absence of error, there is nothing to cumulate."].)

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.