Filed 11/25/20  P. v. Phabmixay CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>JUSTIN PHABMIXAY et al.,<br><br>　　Defendants and Appellants. | G058260<br><br>(Super. Ct. No. 14CF0907)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed in part and reversed in part.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant Justin Phabmixay.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant Michael Tran Nguyen.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Tran Nguyen and Justin Phabmixay appeal from judgments after a jury convicted them of offenses related to an armed robbery. Nguyen argues the following: (1) the trial court erred by denying his motion to sever and bifurcate the gang offense and enhancements; (2) insufficient evidence supports the gang enhancements; (3) his trial counsel was deficient by failing to file a motion to dismiss the gang enhancements; and (4) this court should independently review the court's ruling on his motion to disclose peace officer personnel records. Phabmixay raises the same contentions plus one additional claim—the trial court erred by admitting Nguyen's statements.

As we explain below, because insufficient evidence supports the gang enhancements, we need not address their ineffective assistance of counsel claims. Additionally, any error in failing to bifurcate the gang enhancements did not prejudice them. Finally, the court did not abuse its discretion by denying their motions to disclose peace officer personnel records. We reverse the jury's finding on the gang enhancements as to count 4 and 6 for both Phabmixay and Nguyen. In all other respects, we affirm the judgments.

FACTS

An information charged Nguyen and Phabmixay with the following: kidnapping during the commission of carjacking (Pen. Code, § 209.5, subd. (a),[1] count 1); carjacking (§ 215, subd. (a), count 2); kidnapping to commit robbery (§ 209, subd. (b)(1), count 3); second degree robbery (§§ 211, 212.5, subd. (c), count 4); kidnapping (§ 207, subd. (a), count 5); possession of a firearm by a felon (§ 29800, subd. (a)(1), count 6); evading while driving recklessly (Veh. Code, § 2800.2, count 7); and street terrorism (§ 186.22, subd. (a), count 8). The information alleged they personally used a firearm (§ 12022.53, subd. (b)), as to counts 1, 2, 3, 4, and 5, and they acted to benefit a

_____

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

criminal street gang (§ 186.22, subd. (b)(1)), as to all counts except count 8. The information further alleged Phabmixay suffered two prior serious or violent felony convictions (§§ 667, subds. (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(A)), and one prior serious felony conviction (§ 667, subd. (a)(1)). The information alleged Nguyen suffered two prior serious and violent felony convictions (§§ 667, subds. (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(A)), two prior serious felony convictions (§ 667, subd. (a)(1)), and one prior prison term (§ 667.5, subd. (b)).

I. *Prosecution Evidence*

A. *Offense Evidence*

Around 1:00 a.m. one morning, Roberto V. withdrew $500 from the bank. He added the $500 to the $2,000 that was in his car's center console. As he was driving home in an area known for prostitution, his car began making a knocking noise, so he turned onto a residential street and parked.

A few minutes later, a black truck drove and stopped next to Roberto's car. Roberto believed there were three people in the truck. Roberto tried to drive away, but the truck moved forward and blocked his car.

Phabmixay got out of the truck's passenger side, walked towards Roberto, and pointed a handgun at him while covering his face with a bandana. Nguyen also got out of the truck's passenger side, went to the front of Roberto's car, and pointed an "Uzi" or similar looking semi-automatic weapon at him.

Phabmixay told Roberto to give him money. After Roberto denied having any money, Phabmixay got into the front passenger seat while pointing the gun at him. Nguyen got into the truck. Phabmixay told Roberto to drive, which he did, and the truck followed.

A short distance later, Phabmixay told Roberto to stop his car. Phabmixay found $2,500 in the center console, and he took it. Phabmixay removed the bandana

3

from his face and put the money in it. Phabmixay got out of the car, told Roberto to give him the car keys, threw the bandana on the ground, and got into the truck.

The truck's driver fled, but minutes later, the truck returned, and the three men laughed at Roberto, who demanded they return his car key. The three men again left in the truck. Roberto walked to a nearby restaurant to call 911. The Santa Nita criminal street gang claimed the territory where the men robbed Roberto.

Officers located the truck in a nearby parking lot and ordered the men to get out. One officer saw three men inside the truck. Nguyen sped off and a 30-minute pursuit ensued. During the pursuit, the driver threw something out of the window, but officers never found the item. The truck eventually crashed.

During a standoff, officers exchanged gunfire with the men, but no one was wounded. Phabmixay ran with a black backpack, but officers apprehended him. He had a methamphetamine pipe and a single bullet, but no cash or car key. Officers ordered Nguyen out of the truck and arrested him. Officers did not locate the third man. Officers found a shotgun in the truck. In Phabmixay's backpack, officers found two loaded weapons, a black Glock handgun and a TEC-22 handgun. On the ground near the backpack was a black baseball hat.

Officers brought Roberto to the location of the arrest. He identified Phabmixay as the man who was wearing the bandana and got into his car, and Nguyen as the man who pointed the Uzi at him. At trial, Roberto could not identify the men who robbed him.

A crime scene investigator saw Roberto's car's driver's seat was reclined. A crime scene investigator found a black bandana near Roberto's car. Later, DNA testing revealed Phabmixay could not be excluded as a contributor of DNA collected from the bandana, the TEC-22 handgun, and the shotgun. Additionally, DNA testing revealed Nguyen could not be excluded as a contributor of DNA left on the truck's

4

steering wheel and driver's side door handle. The parties stipulated Phabmixay and Nguyen had suffered felony convictions.

At the police station, detectives Roland Andrade and Leo Rodriguez interviewed Nguyen after advising him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436.[2] The detective saw Nguyen had tattoos that indicated he was a Dragon Family gang member. Nguyen stated he had been "for" Dragon Family since he was a teenager, it had about 30 members, and its territory was Westminster. Nguyen said he grew up in territory claimed by a Hispanic gang, Santa Nita, with "Sammy," who had the moniker "Peanut." He explained it was common for Dragon Family and Santa Nita gang members to interact. Nguyen stated Loc Chung owned the truck, and a friend from Santa Nita had borrowed it. Nguyen stated they were hanging out in the parking lot that night "hooker watching" when the police arrived. When Andrade asked him whether there was a Santa Nita gang member with them, he said, "Yeah, I told you that. I'm not lying." The detectives spent considerable time trying to identify the third man and whether he was a Santa Nita gang member.

*B. Gang Evidence*

Detective Omar Ayala testified as a criminal street gang expert. After detailing his background, training, and experience, Ayala testified concerning the differences between Asian and Hispanic criminal gangs. The primary difference was Hispanic gangs are turf-oriented, but Asian gangs were mobile and did not claim a territory. Additionally, Hispanic gangs advertise their gang through dress and graffiti while Asian gangs are more "discreet." Ayala explained the culture and habits of Asian criminal street gangs, including the importance of respect. Gang members earn respect from other gang members and the community by committing violent acts and intimidating people. Gang members "[put] in work" for the gang to earn respect for the

---

[2] Portions of the interview were played for the jury.

5

gang member and the gang and obtain money to purchase weapons to commit more crimes. Guns are the "ultimate" tool for gaining respect in a gang, and gang members share guns. Gang members get gang tattoos to display their gang to the community. Gang members will commit crimes with members of the same gang because it gives them "back up" and "they trust each other" to not speak to the police. When two gang members commit a crime together, they talk about it to earn respect. Gang members will commit crimes with their ally gang's members.

Ayala testified concerning Dragon Family. Dragon Family was a criminal street gang that had over 20 members. Dragon Family Junior (Junior) was a subset of Dragon Family and Nguyen was an original member of Junior. Dragon Family used the letters "D.F." or the numbers four and six. Dragon Family gang members wear Diamond Supply brand clothes, or Los Angeles Dodgers' or Detroit Tigers' baseball hats because of the "D" emblem. Dragon Family's primary activities were assault with a deadly weapon and being a felon in possession of a firearm. It had three primary rivals, including the Tiny Rascal Gang (Tiny Rascal). Ayala testified concerning the pattern of criminal activity—Nguyen committed one of the offenses.

Ayala opined Nguyen, whose gang moniker was "White Mike," was a member of Dragon Family. He based his opinion on the facts of the case, Nguyen's previous admissions to officers that he was a Dragon Family member, and his Dragon Family tattoos.

Ayala also opined Phabmixay was a Dragon Family gang member. He based his opinion on the facts of the case, items found in his bedroom when officers searched it, and the deterioration of Tiny Rascal. He acknowledged Phabmixay had been associated with Tiny Rascal, Dragon Family's rival, and had Tiny Rascal tattoos. But because he was "contacted" with a hat that had a "D" on it the night of the crime, Ayala opined he was no longer a Tiny Rascal gang member. He would have had to leave Tiny Rascal to join Dragon Family. During a search of Phabmixay's bedroom, officers found

6

a black baseball hat with a "D" on it and a silver belt buckle with an "F" on it. Ayala opined it was logical for him to leave Tiny Rascal to join Dragon Family because it was a more well-known and violent gang. He added the circumstances of the offense established Phabmixay was a trusted associate who was showing his allegiance to Dragon Family by carrying the gang's guns while accepting the possible consequences.

The prosecutor told Ayala that he was going to ask him hypothetical questions and to assume the following facts were true: at least two Dragon Family gang members were in a truck and stopped next to a man in a car (victim); there was a third unknown man in the truck; one Dragon Family member gets out of the truck holding a handgun and demands the victim give him money; a second Dragon Family member gets out of the truck with a semi-automatic gun; the victim refuses to give them money; the man with the handgun gets in the car and orders the victim to drive around the corner and park; the man searches the car, finds and takes $2,000, demands the victim's car key, and leaves; the men get back into the truck and leave; the men in the truck return, laugh at the victim, and leave; the victim walks to a nearby restaurant and calls the police; the police search the area and see the truck parked; the truck's driver flees, leads the police on a chase, and crashes; a man flees with a backpack containing the two guns and "he's got a baseball hat with a 'D' on it;" and police arrest both men.

Ayala opined the offenses were committed for the benefit of a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. He explained the offenses benefitted the gang because the gang members committed a violent act, obtained money from the victim, "[wore] that 'D' hat," and returned to laugh at the victim. Ayala relied on these facts to state the gang members earned respect for themselves and the gang, and instilled fear in the victim. Ayala added the gang members promoted the gang "by wearing their common -- their identifying symbol[,]" using violence to obtain money, and returning to harass the victim. He

concluded their conduct assisted Dragon Family gang members because they aided each other while committing the crime.

On cross-examination, Ayala admitted a gang member could commit a crime for his own personal benefit and if Nguyen was not a member of Dragon Family at the time of the offenses he could have committed the crime for his own personal benefit. Ayala testified he had no personal knowledge Phabmixay was jumped out of Tiny Rascal or joined Dragon Family, or if Nguyen was still an active member of Dragon Family at the time of the offenses. He repeated that at the time of the offenses, Dragon Family and Tiny Rascal were rivals. He added rival gang members do not assist each other in committing crimes, promote their rival gangs, benefit their rival gangs, or make money for their rival gangs. He stated there was no evidence either man yelled a gang name or flashed a gang sign. When Nguyen's counsel asked Ayala whether he had any information either man was wearing Dragon Family attire, he said, "No." The following exchange occurred:

"[Counsel]: [Y]ou were asked in your hypothetical to assume that . . . Phabmixay was wearing a hat with the letter 'D' on it; correct?"

"[Ayala]: Correct.

"[Counsel]: Does it change your opinion at all to know that . . . Phabmixay was not wearing a hat with a 'D,' it just happened to be inside of a backpack?

"[Ayala]: So it was inside meaning - -

"[Counsel]: Right. That he was never wearing it. A black hat with a 'D' was just found that evening, but not on him. So that wouldn't be promoting anything, would it?

"[Ayala]: No. If it was hidden away, no."

"[Counsel]: Right. In order to promote, it would have to be something that they're displaying; correct?

"[Ayala]: Correct."

"[Counsel]: . . . Neither one of them, to your knowledge, was wearing anything that said Dragon Family that night, were they?

"[Ayala]: No.

"[Counsel]: And you don't know of anything other than the hat with the 'D' that was inside of the backpack; correct?

"[Ayala]: Correct."

Ayala admitted there was no evidence either man yelled a gang name or flashed a gang sign during the offenses or when officers arrested them. Ayala knew that in 2010 and 2013 Nguyen told police officers he was no longer a member of Dragon Family.

Phabmixay's counsel asked Ayala to look at a photograph of Phabmixay and another man flashing a Tiny Rascal gang sign. Ayala agreed Phabmixay was wearing a hat with a "D" on it. Ayala agreed Phabmixay never claimed any gang other than Tiny Rascal, and he was unaware of any gang member joining another gang without members of his old gang assaulting him. To successfully change gangs, the person would have to cover his old gang's tattoos.

Detective William Drinnin testified that three months before the offenses here, he conducted a traffic stop and talked with Phabmixay. Phabmixay told him he had not been "jumped out" of Tiny Rascal but he was no longer part of the gang.

After the prosecution rested, on Phabmixay's and Nguyen's motions, the trial court dismissed count 7 against Phabmixay and counts 1 and 2 against them both. They also moved to dismiss count 8. The prosecution objected, arguing there was sufficient evidence Phabmixay was a Dragon Family gang member. The court dismissed count 8 against them both. The court denied their motion to dismiss counts 3, 4, and 5. Later, the court granted the prosecution's motion to dismiss count 5.

## II. Defense Evidence

Nguyen offered evidence to support their theory Roberto fabricated the story and he picked up a prostitute and she stole the money from him.

## III. Verdicts and Sentencing

The jury convicted Phabmixay of counts 4 and 6, and found true the enhancements. The jury convicted Nguyen of counts 4, 6, and 7 and found true the enhancements as to counts 4 and 6. The jury was unable to reach a verdict on count 3, and the trial court declared a mistrial and later dismissed it (§ 1385).

The trial court sentenced Phabmixay to three years on count 4, 10 years on the personal use enhancement, and 10 years on the criminal street gang enhancement for a total prison sentence of 23 years. The trial court sentenced Nguyen to 25 years in prison on count 4. As relevant here, the court struck the sentence on the criminal street gang enhancement.

## DISCUSSION

### I. Sufficiency of the Evidence—Section 186.22, subdivision (b)(1)

Phabmixay and Nguyen argue insufficient evidence supports the jury's findings they committed counts 4 and 6 for the benefit of a criminal street gang. We agree.

When considering a defendant's challenge to the sufficiency of the evidence of a gang enhancement, we review the entire record most favorably to the judgment to determine whether the record contains substantial evidence from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) We do not reweigh evidence or reassess a witness's credibility, and we presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Id*. at p. 60) We ask whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable

10

doubt. (*Ibid*.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid*.)

Section 186.22, subdivision (b)(1), provides a sentencing enhancement for felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The prosecution must establish both prongs of the gang enhancement. (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484.) "First, the prosecution is required to prove that the underlying felonies were 'committed for the benefit of, at the direction of, or in association with any criminal street gang.' [Citation.] Second, there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' [Citations.]" (*People v. Rios* (2013) 222 Cal.App.4th 542, 561.) Section 186.22, subdivision (b)(1)'s enhancement does not depend on gang membership. (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1366 (*Garcia*).)

"'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. (. . . *Albillar, supra,* 51 Cal.4th at p. 63 . . . .)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) However, the expert's testimony must be grounded in admissible evidence. "A hypothetical question not based on the evidence is irrelevant and of no help to the jury. '"Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?"' [Citation.] Expert testimony *not* based on the evidence will not assist the trier of fact. Thus, '[a]lthough the field of permissible hypothetical questions is broad, a party cannot use this method of questioning a witness to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced.'

11

[Citation.]" (*Id.* at p. 1046.) "[P]urely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang because any violent crime enhances the gang's reputation are insufficient to support a gang enhancement. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820 (*Ramirez*); see *People v. Franklin* (2016) 248 Cal.App.4th 938, 949 (*Franklin*) [expert opinion may not be based on assumption of fact without evidentiary support].)

*A. First Prong*

Section 186.22, subdivision (b)(1), provides three alternatives for establishing the first prong—that the underlying offense was "gang related." The offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; or (3) in association with a gang. (*Albillar, supra,* 51 Cal.4th at p. 59.) A crime is committed in association with a gang if the "defendants relied on their common gang membership and the apparatus of the gang in committing" the charged felonies. (*Id*. at p. 60.) The crime itself must have some connection with the gang's activities and cannot be based solely on the defendant's gang affiliations and criminal history. (*Garcia, supra,* 244 Cal.App.4th at p. 1367.) The first prong therefore may be established with substantial evidence two or more gang members committed the crime together, unless there is evidence they were "'on a frolic and detour unrelated to the gang.' [Citation.]" (*Albillar, supra,* 51 Cal.4th at pp. 61-62.)

Here, there was insufficient evidence counts 4 and 6 were gang related. Ayala testified both Nguyen and Phabmixay were Dragon Family gang members and the crimes were committed in association with Dragon Family because they committed a violent act, obtained money from the victim, "[wore] that 'D' hat," and returned to laugh at the victim. Ayala relied on these facts to state the gang members earned respect for themselves and the gang, and instilled fear in the victim.

Ayala's testimony, however, was deficient in numerous respects. First, although gang membership is not an element of the gang enhancement, Ayala relied on

12

the fact Nguyen and Phabmixay were Dragon Family members in forming his opinion. However, the evidence upon which he based his opinion was tenuous at best. Although there was evidence Nguyen was a founding member of Junior and became a member of Dragon Family, on two occasions, four years before the offenses, and one year before the offenses, Nguyen stated he was no longer a member of Dragon Family. In any event, gang affiliations and criminal history without more cannot serve as a basis for the enhancement. During a search of Phabmixay's bedroom the night of the offenses officers found a hat with a "D" and a belt buckle with an "F." But to conclude he was a Dragon Family gang member based on this evidence was speculative. A photograph showed Phabmixay, who was wearing a hat with a "D," and another man flashing Tiny Rascal gang signs. Needless to say, he would not wear Dragon Family gear in the presence of Tiny Rascal gang members. The belt buckle alone does not demonstrate he left Tiny Rascal and joined Dragon Family. Three months before the offenses here, Phabmixay told an officer he had not been "jumped out" of Tiny Rascal but he was no longer part of the gang. Ayala agreed he had not claimed a gang other than Tiny Rascal and Ayala did not know of a gang member joining a different gang without being "jumped out" of his old gang or covering his old gang's tattoos. The record supports the conclusion Phabmixay was a Tiny Rascal gang member, not a Dragon Family gang member. Finally, Ayala said Dragon Family and Tiny Rascal were rivals and rival gang members do not commit crimes with each other.

In forming his opinion, Ayala relied on the fact Phabmixay wore a hat with a "D." But there was no evidence to support that conclusion. The record establishes the hat was in the backpack. On cross-examination, Ayala admitted that if the hat was in the backpack, Phabmixay would not be promoting anything. Ayala agreed that to promote the gang Phabmixay would have to wear the hat. Additionally, the evidence concerning gang attire was conflicting. Ayala initially testified Asian gangs are discreet, but then testified about Dragon Family's attire and symbols.

13

Ayala also relied on the fact Nguyen and Phabmixay obtained money for the Dragon Family. But he agreed gang members can commit crimes for their personal benefit. Ayala testified Dragon Family's primary activities were aggravated assault and unlawful weapons possession. It was not robbery. The fact they used weapons does not establish by itself the crimes were gang related. Many robbers use guns.

Ayala, like many gang experts, testified at length about gang members committing violent acts with weapons to increase the gang member's and the gang's reputation. However, these offenses were not committed in Dragon Family claimed territory. They were committed in Santa Nita claimed territory. Although there was evidence a third man was in the truck, officers never found him. Other than Ayala's opinion, the record includes no evidence to support the gang enhancment. (*Franklin, supra,* 248 Cal.App.4th at p. 950.)

Finally, the Attorney General asserts the offenses were gang related because Nguyen and Phabmixay returned and heckled Roberto. They did return, but what is most striking is the absence of any gang evidence during that encounter. There is no evidence that during the offenses Phabmixay or Nguyen were wearing Dragon Family attire, claimed membership in Dragon Family, flashed a Dragon Family sign, or exposed any gang tattoos. (See *Ramirez, supra,* 244 Cal.App.4th at p. 819 [insufficient evidence first prong where no gang attire worn, no gang names called out, and no gang signs flashed].) Had they desired to enhance the gang's reputation in the area, you would think they would have told someone they were in the gang. The record before us demonstrates the offenses were not gang related but instead were "'a frolic and detour unrelated to the gang.' [Citation.]" (*Albillar, supra,* 51 Cal.4th at pp. 61-62.)

B. *Second Prong*

"[T]he scienter requirement in section 186.22(b)(1) . . . applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar,*

*supra,* 51 Cal.4th at p. 66.) "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id*. at p. 68.) "'"Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."' [Citation.]" (*Franklin, supra,* 248 Cal.App.4th at p. 949.)

Here, there was insufficient evidence Phabmixay and Nguyen committed counts 4 and 6 with the specific intent to promote, further, or assist Dragon Family. Ayala testified the hypothetical gang members promoted the gang "by wearing their common . . . identifying symbol[,]" assisting each other to commit violence and obtain money, and returning to harass the victim.

As we explain above, the record does not include any evidence Phabmixay wore the hat with the "D" during the robberies, and Alaya's belief he did and his reliance on the fact in forming his opinion is flawed. He admitted as much on cross-examination.

Without considering that fact, what the evidence shows is the following: the truck cut off Roberto; one man exited the truck with a handgun and demanded Roberto's money; another man exited the truck with a semi-automatic weapon; when Roberto failed to give them money, the first man got into his car and told him to drive; Roberto drove and parked; the man took money and Roberto's car key, and got back into the truck; the truck left and a few minutes later returned, when the men laughed at Roberto; the police found the truck and a high-speed chase ensued until the truck crashed; and when the truck crashed, Phabmixay fled on foot with a backpack containing two weapons.

Noticeably absent from these facts is any evidence Phabmixay and Nguyen specifically intended to benefit Dragon Family. This evidence establishes they robbed Roberto but nothing more. Again, they were not wearing Dragon Family attire, claiming Dragon Family, or flashing Dragon Family signs. "Missing was all evidence typical of

15

crimes committed for the benefit of the gang and intended to promote, further, or assist the commission of crimes by gang members . . . ." (*People v. Perez* (2017) 18 Cal.App.5th 598, 613.)

Two cases help to explain our conclusion. In *People v. Garcia* (2017) 9 Cal.App.5th 364, 379, the court addressed whether there was sufficient evidence defendant committed assaults for the benefit of a criminal street gang. In concluding there was sufficient evidence, the court relied on the following: defendant and another participant in the assaults were members of the same gang based on photographs showing them wearing gang attire and throwing gang signs; the assaults were in the gang's claimed territory; the assaults were the gang's primary activity; and defendant and his compatriot worked in concert and yelled gang names and threats during assaults. (*Id.* at p. 380.)

In *Ramirez, supra,* 244 Cal.App.4th at page 818, the court addressed whether there was sufficient evidence at the preliminary hearing. In concluding there was insufficient evidence, the court relied on the following: there was a lack of evidence showing defendants were known members of the same gang; and defendants did not wear gang attire, call out gang names, or flash gang signs. (*Id.* at p. 819.)

Here, the evidence more closely resembles *Ramirez* than it does *Garcia*. The record establishes the men, who may or may not have been active gang members or associates and, if so, were perhaps from rival gangs, simply robbed a man at gunpoint in a third gang's claimed territory and fled from police without wearing gang attire, calling out a gang's name, or flashing a gang's sign.

As our Supreme Court has stated, not every crime committed by gang members is gang related. (*Albillar, supra,* 51 Cal.4th at p. 60.) Here, the prosecution did not satisfy its burden of proving Phabmixany and Nguyen committed counts 4 and 6 for a criminal street gang. We reverse the jury's finding on the gang enhancements on counts 4 and 6 for both Phabmixay and Nguyen.

16

Because we reverse, we need not address Phabmixay's and Nguyen's ineffective assistance of counsel claims. Additionally, we need not address Phabmixay's claim the trial court erred by admitting Nguyen's statements to police.

## II. *Bifurcation of Criminal Street Gang Enhancment*

Phabmixay and Nguyen contend the trial court erred by denying their motions to bifurcate trial of the gang enhancement allegations.[3] Any error was harmless.

"Our courts have consistently recognized the efficiencies that are achieved by way of a joint trial of related matters. [Citation.] Thus, in order to prevail on a motion to bifurcate a gang enhancement, a defendant must '"clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried."' [Citation.] 'In cases not involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]' [Citation.] [¶] 'Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself . . . a court may still deny bifurcation.' [Citation.]" (*Garcia, supra,* 244 Cal.App.4th at p. 1357.)

---

[3] Because the trial court dismissed count 8, the gang substantive offense, we focus our discussion on bifurcation of the enhancement and not severance of the offense. (*People v. Burnell* (2005) 132 Cal.App.4th 938, 946, fn. 5 [count severed and enhancement bifurcated].)

17

We need not address whether the trial court erred by denying Phabmixay's and Nguyen's motion to bifurcate because any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Police officers responded to the area and identified a truck matching the description Roberto provided. When the men saw the police, they fled. When the high-speed chase ended, Phabmixay fled with a backpack that contained two guns that matched the descriptions Roberto provided. At the scene, Roberto identified Phabmixay and Nguyen as the men who robbed him. Forensic testing connected Phabmixay to the black bandana found near Roberto's car. Simply put, this was overwhelming evidence of their guilt as to all counts. Finally, the jury deadlocked on count 5, which suggests the gang evidence was not so inflammatory that it evoked an emotional bias against them.

*III.  Pitchess Motion*

Phabmixay and Nguyen request we make an independent review of the trial court's ruling on the prosecution's motion to disclose peace officer personnel records. The Attorney General does not object to our review.

Before trial, the prosecution filed a motion for discovery of peace officer personnel records. The records concerned an internal affairs investigation of an officer who was involved in the shooting in this case. After an in camera hearing, the trial court determined there was no discoverable information.

A criminal defendant is entitled to the discovery of confidential police officer personnel records if the information contained therein is relevant to her ability to defend against the charge. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 537-538.) To obtain such records, the defendant must submit an affidavit showing good cause for the discovery. (Evid. Code, § 1043, subd. (b)(3).) A showing of good cause requires a defendant seeking *Pitchess* discovery "to establish . . . a logical link between [a proposed defense] and the pending charge" and "to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events."

18

(*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021.)  Discoverable information is "limited to instances of officer misconduct related to the misconduct asserted by the defendant.  [Citations.]"  (*Ibid.*)

Under *People v. Mooc* (2001) 26 Cal.4th 1216, 1229-1232, upon a request from a defendant, an appellate court may review the sealed transcript of a trial court's in camera *Pitchess* hearing to determine whether the trial court disclosed all relevant documents.  We may review the transcript of the in camera proceeding.  (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1221, fn. 10.)  We review the trial court's ruling on such a motion for abuse of discretion. (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.)

We independently reviewed the sealed transcript of the trial court's in camera hearing on the prosecution's motion.  We conclude the trial court did not abuse its discretion.

## DISPOSITION

We reverse the jury's finding on the gang enhancements as to count 4 and 6 for both Phabmixay and Nguyen.  In all other respects, we affirm the judgments.

O'LEARY, P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.

19