Filed 12/21/22  P. v. Gold CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079290 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD283771) |
| JACK GOLD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Andrea S. Bitar, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Bonita Y. was punched and kicked at a bus stop on Broadway by a man in dark clothes, with long hair pulled back, who then rode east on a bicycle. San Diego Police stopped Jack Gold twenty minutes later, about a mile east.

He matched the description of the attacker.  A witness to the attack identified Gold as the attacker at a curbside "show up" and identified Gold as the attacker again at trial.  Gold denies that he was the attacker and contends that a comment a police officer made at the curbside identification was unduly suggestive, tainting both the out-of-court and in-court identifications.  Gold also contends that CALCRIM No. 372, a jury instruction which permits the jury to infer guilt from a defendant's flight, improperly presumed that Gold was the assailant.  We conclude Gold's contentions have no merit, and we affirm the judgment.

I.

BACKGROUND AND PROCEDURAL FACTS

On October 20, 2019, around 5:40 p.m., Bonita sat at a bus stop on Broadway, in downtown San Diego.  A man approached her on a dark-colored bicycle and said something about her watching or spying on him.  Bonita stood and said she was not watching him, or she did not know him, and she walked away.  When Bonita pulled out her phone, the man knocked it out of her hand and punched her in the face.

After the first punch, Bonita fell to the ground and got back up.  The assailant punched her again, and she fell again.  He punched her face a third time, and he also kicked her a few times while she was on the ground.  She attempted to protect her face with her hands, and at one point, she grabbed a backpack the assailant wore; it was dark and felt like nylon.  The man rode off on his bicycle, heading east on Broadway.  Bonita did not get a good look at him because it happened quickly, and she was trying to protect herself.

Vanessa S. was across the street in her car and saw the attack out of the corner of her eye.  She observed the man stomp on the woman's head three times, as the victim tried to protect herself by placing her hands in

2

front of her face. Vanessa drove to the bus stop after the man left. She did not see the man's face or notice a bike. The man wore black clothing, a long-sleeved top, a sweater or jacket, and black shorts.

Vanessa called 9-1-1, and during that call, she told the dispatcher that Bonita said the attacker was a Caucasian male with a brown beard, about 20 to 30 years old, and that he wore black clothes and shorts. The assailant wore a backpack and rode a bike.

San Diego Police Officer Gordon Leek responded to the scene. He spoke with Vanessa and Robert H.[1]

Robert was across the street, about 30 feet away, when he saw the attack. His view was unobstructed. He observed the assailant swinging his fists at a black woman and hitting her three to five times; she tried to grab his bag at one point, and he saw the victim fall to the ground. The victim tried to shield her face while she was on the ground. The attack lasted about 20 to 25 seconds. The attacker rode a bike east on Broadway, pedaling fast, away from the crime.

Robert told police the assailant was a White man with dark, bushy eyebrows, a thick, dark, curly beard, and hair pulled back into braids or a bun. The assailant was about a foot taller than the victim. Robert believed the assailant wore a black T-shirt and had white text on his back; he also remembered seeing the color red somewhere. The assailant had a black backpack and rode a bicycle. Robert believed he could identify the attacker if he saw the man again.

Officer Leek broadcast a description of the assailant: male, on a bike heading east on Broadway, with a brown beard, wearing dark clothing, including black shorts, and carrying a black backpack. Twenty minutes after

---

[1] At trial, Robert was introduced as Jane H.

he broadcast the description, he received word that a suspect had been detained near Balboa Park.

San Diego Police Officer Diego Arellanes was on patrol in a marked car near Balboa Park when he heard the dispatch call around 6:05 p.m. regarding a battery in the 1500 block of Broadway. Officer Arellanes observed a man matching the description around Pershing and 26th Street, about a mile east of Broadway, whom he identified later as Gold. Officer Arellanes followed the man, who was riding a black and red road bike with gears and a basket hanging on the front.

The man on the bike wore a dark shirt, a very dark blue, long-sleeved sweater wrapped around his waist, and a black, cinched athletic bag that had white text on it with a red bag folded in it that was sticking out. The man was also wearing gloves, cuffed, dark blue jeans that looked like shorts, and he was sporting a bushy beard and long, brown hair pulled into a bun. The man wore headphones, but he later pulled them down around his neck. Officer Arellanes detained the man around 6:07 p.m. and placed him in the rear of his patrol vehicle.

Officer Leek transported Robert to where Officer Arellanes had detained Gold. During the drive, Officer Leek read an admonition to Robert:

> "I want you to look at somebody we have detained. Do not conclude from the fact that we have detained someone that he or she is the guilty party. You are not obligated to identify anyone. It is just as important to free an innocent person as to identify the guilty person. Be aware that sometimes people who commit crimes will try to disguise their appearance by changing clothes and wearing hats, sunglasses, or wigs. Do not say anything or make any gestures, nod, point, et cetera, until you have totally viewed this person."

4

Once Officer Leek came to a stop, Robert remained in the vehicle. Officer Leek left on the high beams and white LED lights. He wore a body camera, which recorded him saying to Robert, "Sometimes we put people in handcuffs that are just detained. Doesn't mean they're under arrest; so don't [let] that prejudice your . . . ."

Officer Arellanes removed Gold from his patrol car, about 15 to 20 feet away from Robert. Once Gold was in place, the following exchange occurred, around 6:39 p.m.:

> "[OFFICER] LEEK: These are super blind. He can't see.[2] (Unintelligible.) Did he have the ear phone things on—ear buds or whatever those are—not earbuds—uh . . .
>
> "[ROBERT]: Headphones.
>
> "[OFFICER] LEEK: . . . Beats?
>
> "[ROBERT]: I don't notice them but yeah that's him . . .
>
> [¶] . . . [¶]
>
> "[OFFICER] LEEK: You sure that's him? And uh—the other officer already took off some of the guy's clothes and stuff like that—anything about the bike—can you identify the bike? And . . .
>
> "[ROBERT]: Just—uh . . . it wasn't anything fancy. It's just like a regular street bike.
>
> [¶] . . . [¶]
>
> "[OFFICER] LEEK: Okay, (unintelligible) . . . and you said, that's him? I believe was your—direct quote—that's him?
>
> "[ROBERT]: Uh huh . . .

---

2    At trial, Officer Leek testified that this comment meant that Gold, the suspect, could not see into the patrol car or see Robert.

"[OFFICER] LEEK: . . . anything else to add to it—and then you also said, that's his—um . . .

"[ROBERT]: Bag.

"[OFFICER] LEEK: That's his bag.

"[ROBERT]: And—uh—I recognize his shorts."

Police then arrested Gold.

The attack left Bonita's face severely swollen, and she lost two teeth. She also dislocated two fingers, and one finger bone poked out through the skin. The day after her attack, a detective visited Bonita in the hospital. Bonita told the detective that her attacker was a White male in his 30's, who stood at about five feet, eight-to-ten inches tall, and weighed 190 to 200 pounds. She said he had brown eyes and hair and an unkempt, large or bushy beard. She described his clothing as a dark colored T-shirt and said he had a black and gray backpack, and she said he rode a dark-colored bicycle. However, she was not able to identify him from a six-pack photo array of possible suspects.

At trial, Bonita described her attacker as Caucasian, medium build, in his late 30's, with dark hair that was pulled back, and wearing a dark-colored T-shirt and a dark backpack of nylon material.

At the preliminary hearing, Robert described the assailant as Caucasian, wearing light red athletic shorts and a black T-shirt, with a beard and dark brown hair pulled into a pony tail. Robert also testified he thought the bike was not a mountain bike. At trial, Robert described the assailant as a White male, with a dark beard and dark hair pulled into a bun. The assailant wore "a lot of black," including a black T-shirt, and he carried a black drawstring bag with a white logo. Robert testified he saw the color red,

6

and he believed the assailant was taller than five feet, ten inches, Robert's height.

On November 5, 2019, the People filed an information charging Gold with assault by means likely to produce great bodily injury (Pen. Code,[3] § 245, subd. (a)(4)) and two special allegations, one for great bodily injury during the commission of a felony (§ 12022.7, subd. (a)) and the other for felony with infliction of great bodily injury (§ 1192.7, subd. (c)(8)).

Gold filed a motion in limine to exclude Robert's curbside identification, alleging Officer Leek had made unduly suggestive comments. The court denied the motion.

The case proceeded to trial, and Robert identified Gold as the assailant in court.

The court instructed the jury with CALCRIM No. 372, Defendant's Flight, over defense objections. That instruction states: "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

The jury asked the court to read back Officer Leek's testimony, including before and after the body camera break, which the court did.

The jury returned a guilty verdict and found that Gold had inflicted great bodily injury upon the victim (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). The court sentenced Gold to four years, plus an enhancement of three years (§ 12022.7, subd. (a)).

Gold timely appealed.

---

[3] Statutory references are to the Penal Code unless otherwise specified.

## II.

## DISCUSSION

"[A]lthough a one-person showup may pose a danger of suggestiveness, such showups 'are not necessarily or inherently unfair. [Citations.] Rather, all the circumstances must be considered.' " (*People v. Medina* (1995) 11 Cal.4th 694, 753.) " 'The law permits the use of in-field identifications arising from single-person show-ups so long as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' " (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1359 (*Garcia*), quoting *In re Carlos M.* (1990) 220 Cal.App.3d 372, 387.) For an identification to violate a defendant's due process rights, "the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*People v. Ochoa* (1998) 19 Cal.4th 353, 413.)

To evaluate whether an out-of-court identification is so unreliable that it violates a defendant's right to due process, courts ask "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*).) The burden of showing the identification was unreliable falls to the defendant. (*Ibid.*)

8

A. Out-of-court Identification Was Not Unduly Suggestive

Gold contends that Officer Leek's question, "Did he have the ear phone things on[?]" was unduly suggestive because it implied that the person Robert was observing was the suspect and he wanted clarification about an article of clothing. However, the question could equally be understood to be asking whether the assailant Robert had observed earlier had "ear phone things on" without presuming it was the same person before him in the moment. Thus, the comment is not itself so unduly suggestive that it would give rise to a substantial likelihood of misidentification. (See *Garcia, supra*, 244 Cal.App.4th at p. 1359.)

Even if the isolated comment were unduly suggestive, when we consider the totality of the circumstances, we conclude it was nonetheless a reliable identification.

*Opportunity to View Suspect at Time of Offense and Degree of Attention*

Robert observed the attack itself and was attentive. He was across the street, about 30 feet away, and his view was unobstructed. He saw the attacker swinging his fists and hitting the victim three to five times, and he watched the victim fall to the ground. He noted the woman attempt to grab her assailant's backpack. His description of the attack was consistent with what the victim reported to police, including the number of punches and her attempts at grabbing her assailant's backpack. Like the victim, Robert saw the assailant ride his bike east on Broadway.

*Accuracy of Prior Description*

Robert told Officer Leeks the assailant was a White man with dark, bushy eyebrows, a thick, dark curly beard, and hair pulled back. He believed the assailant wore a black T-shirt, wore a black backpack, and had white text on his back. He remembered seeing the color red. This is consistent with

9

Gold's appearance.  For example, Gold wore a dark T-shirt, a very dark blue, long-sleeved sweater wrapped around his waist, a black cinched, athletic bag (backpack) with white text on it and a red bag folded into it that was sticking out.  Robert said the assailant had a backpack and there was white lettering on his back, which is consistent with Gold's cinched black bag with white lettering or a logo in it.  Gold also wore cuffed, dark blue jeans that looked like shorts, and he had a bushy beard and long, brown hair pulled back into a bun.

The man Robert observed had a bushy beard and long hair pulled back, and Gold had a bushy beard and long hair pulled back.  Robert remembered seeing red, and Gold had some red sticking out of the cinched bag, and the bike was black and red.  Finally, Robert saw the man ride off on a bike; Gold was on a bike when he was stopped.

Gold argues there were inconsistencies between Robert's initial description and what Gold was wearing or had with him.  For example, Robert described the assailant as wearing shorts, but Gold was wearing dark colored jeans.  Robert told Officer Leek the bike was not anything fancy, just a regular street bike, but Gold's bike had gears on it and a basket, neither of which Robert mentioned.  Robert initially told police that the assailant's hair was pulled back into braids or a bun and testified at the preliminary hearing that it was pulled back into a pony tail, but Gold's hair was pulled back into a bun.  None of these discrepancies makes Robert's description inaccurate.  Although Gold was wearing pants, he had them rolled up to the height of shorts, and they were dark in color, making them consistent with Robert's description.  And while Gold's bicycle had gears and a basket on it, not referencing or recalling those details does not make Robert's description incorrect; the bike was a road bike.  Robert's description of the assailant's

10

hair being pulled back in braids, a pony tail, or a bun is, likewise, not inconsistent with Gold's hair being pulled back into a bun. All those possibilities reflect that the assailant had long hair that was pulled off his face. These minor differences do not undermine the match between Robert's description of the attacker and Gold's appearance at the show-up.

*Level of Certainty at the Time of the Identification*

Robert also expressed certainty at the time he identified Gold as the attacker. When he first saw Gold, he commented that he had not noticed head phones, but regardless, "yeah that's him . . ." Then, after Officer Leek asked, "You're sure that's him?" and "Okay, and you said, that's him?" Robert responded, "Uh huh," and even noted that he recognized Gold's shorts. Consistent with Robert's comment at the scene that he believed he could identify the attacker if he saw the man again, Robert did not hesitate or hedge when identifying Gold.

*Lapse of Time Between Offense and Identification*

Finally, less than an hour lapsed between the initial attack, around 5:40 p.m., and Robert identifying Gold as the assailant at 6:39 p.m.

We also note that Officer Leek read the standard admonition to Robert, explaining that just because a man had been detained, it did not mean he was guilty, and that Robert was not obligated to identify anyone as the attacker. Officer Leek told Robert not to make any assumptions based on whether a person was handcuffed, commenting that "Sometimes we put people in handcuffs that are just detained. Doesn't mean they're under arrest, so don't [let] that prejudice you[ ]. . . ."

Considering the totality of the circumstances, we conclude Gold has failed to demonstrate the out-of-court identification was unreliable. (See *Cunningham*, *supra*, 25 Cal. 4th at p. 989.) Because we find the curbside

11

identification was not improperly suggestive, the in-court identification was not tainted. As a result, Gold was not prejudiced by Robert's identification of him as the assailant.

B. The Court Did Not Err by Instructing with CALCRIM No. 372

We review of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) In so doing, we assess "whether the instruction accurately states the law" and we "consider whether there is a reasonable likelihood that the trial court's instructions cause the jury to misapply the law in violation of the Constitution. [Citations.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We view the challenged instruction " 'in the context of the instructions as a whole,' " and we review " 'the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*Ibid.*)

Gold contends that the use of CALCRIM No. 372 was erroneous because there was an identity question, and the instruction presumes the defendant was the properly identified. He maintains that because there was no evidence at trial that established that he was the one who departed the crime scene, that instruction was improper.

CALCRIM No. 372 reads as follows:

> "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

We disagree with Gold that CALCRIM No. 372 compresses two analyses into a single one. In *People v. Mason* (1991) 52 Cal.3d 909, the Supreme Court rejected a claim that it was error to instruct the jury on evidence of flight when identity is a contested issue. It explained: "If there is

12

evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight. [Citation.] 'The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. [Citation.] The jury's need to know these things does not change just because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.' [Citation.]" (*Id.* at p. 943.)

CALCRIM No. 372 begins with a determination of identity because it asks the jury to first conclude that the *defendant* fled or tried to flee. If the jury concluded that the defendant was not the assailant, then the defendant could not have fled or tried to flee, and the remainder of the instruction would be inapplicable. Thus, complying with the jury instruction meant that only after the jury determined that Gold was the assailant, could it then determine how much weight to accord Gold's flight in resolving issues that bore on guilt. There was no conflation of the issues.

Here, there was evidence that the defendant was the assailant. And there was evidence the assailant fled the scene on a bike, traveling east on Broadway. Thus, a jury could properly find that Gold's flight supported an inference of consciousness of guilt.

### C. No Prejudice from Alleged Instructional Error

Even if CALCRIM No. 372 were erroneously given, Gold did not suffer prejudice as a result. Under such an analysis, a verdict should be reversed only when "it is reasonably probable the defendant would have fared better in the absence of the error." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497;

13

*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Here, the evidence supports the jury's verdict even without considering the assailant's flight to be some evidence of awareness of guilt.

Bonita, Vanessa, and Robert all described the assailant similarly and consistently with Gold's description at the time he was detained.  We previously discussed Robert's description and its similarities to Gold's appearance when Officer Arellanes detained him.  Vanessa and Bonita's descriptions were also consistent with Gold's appearance.  Vanessa said he wore black clothing, a long-sleeved top, like a sweater or jacket, and black shorts.  Bonita described the attacker as wearing black clothes and shorts and a dark, nylon backpack.  Like Robert, Bonita reported that the attacker rode a bike and also testified that the attacker's hair was pulled back.

Officer Arellanes stopped Gold around Pershing and 26th street, about a mile from where the attack occurred, shortly before 6:07 p.m., not long after the attack began around 5:40 p.m.  Thus, the timing and location coincided with the timing of the attack as well.  Given these details and the strength of Robert's identification, it is not reasonably probable that absent an instruction about how flight can evidence consciousness of guilt, the outcome would have been more favorable to Gold.

DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.